IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) | CIVIL NO. 06-00451 SOM/BMK CIVIL NO. 07-00372 SOM/BMK |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| and | ) ) | |
| | ) | |
| AHMED ALMRAISI, NAGI A. ALZIAM, SAMED KASSAM, MUTHANA A. SHAIBI, NORK YAFAIE, ABDULLAH YAHIA, AHMED AL-MLHANY, | ) ) ) ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART NCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY OR ON BEHALF OF PLAINTIFF- |
| | ) | INTERVENOR SAMED KASSEM; |
| Plaintiffs-Intervenors, | ) ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT NCL |
| vs. | ) ) | AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL |
| | ) | CLAIMS BY THE EEOC AND BY |
| NCL AMERICA, INC., and NCL (BAHAMAS), LTD., | ) ) | INTERVENORS; ORDER DENYING EEOC'S COUNTER MOTION FOR |
| | ) | SUMMARY JUDGMENT; ORDER |
| Defendants. | ) ) | DENYING BOTH OF DEFENDANT NCL AMERICA, INC.'S MOTIONS FOR |
| _____ | ) ) | RULE 11 SANCTIONS |
| | ) | |
| ASHMED ALMLHANY, | ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| NCL AMERICA, INC., | ) ) | |
| | ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART NCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY OR ON BEHALF OF PLAINTIFF-INTERVENOR SAMED KASSEM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY THE EEOC AND BY INTERVENORS; ORDER DENYING EEOC'S COUNTER MOTION FOR SUMMARY JUDGMENT; ORDER DENYING BOTH OF DEFENDANT NCL AMERICA, INC.'S MOTIONS FOR  RULE 11 SANCTIONS

I.        INTRODUCTION.

In this employment discrimination case, the court has before it two motions for summary judgment, one counter motion for summary judgment, and two motions for Rule 11 sanctions.

In 2004, Plaintiffs-Intervenors were employed by the cruise ship MS Pride of Aloha, which is owned and operated by NCL America, Inc. ("NCL America").  In July 2004, Plaintiffs-Intervenors were discharged or constructively discharged, allegedly based on their national origin (Yemeni/Middle Eastern) and/or religion (Muslim).

On August 22, 2006, Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a complaint against NCL America, Norwegian Cruise Line Ltd., and NCL Corporation Ltd. (collectively, "Defendants"),[1] alleging employment discrimination in violation of Title VII of the Civil Rights Act.  On November 22, 2006, the discharged employees intervened as Plaintiffs-Intervenors, alleging unlawful discrimination in violation of Title VII, 42 U.S.C. § 1981, and Haw. Rev. Stat. § 378-2.  In

---

[1] On February 1, 2008, this court dismissed all claims against NCL Corporation Ltd.  See Doc. No. 287.  Moreover, the court noted that all claims against Norwegian Cruise Line Ltd. had become moot in light of Plaintiffs' motion to amend their complaint to add NCL (Bahamas), Ltd.  See id. at 14.  On February 15, 2008, Plaintiff EEOC filed an Amended Complaint, naming only NCL America, Inc., and NCL (Bahamas), Ltd., as Defendants.  See Doc. No. 300.  Also on February 15, 2008, the parties filed a joint stipulation to dismiss with prejudice Norwegian Cruise Line, Ltd.  See Doc. No. 302.

addition, Plaintiffs-Intervenors claim intentional infliction of emotional distress ("IIED") and/or negligent infliction of emotional distress ("NIED").

Defendants'[2] present motion for summary judgment with respect to all claims by or on behalf of Plaintiff-Intervenor Samed Kassem (the "Constructive Discharge Motion") argues that (1) Kassem's constructive discharge termination claim should be dismissed because there are no triable issues as to whether a reasonable person in his position would have felt compelled to leave; (2) the IIED claim should be dismissed as untimely, as not based on outrageous conduct, and as preempted by section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); and (3) the NIED claim should be dismissed as time-barred, as not supported by any physical injury, and as preempted by section 301.

Plaintiffs rigorously contest these arguments.  See EEOC's Opposition to Defendants' Motion for Summary Judgment (Jan. 25, 2008) ("EEOC Opp'n to Constructive Discharge Motion");

_____

[2]  This motion was originally filed only by NCL America.  See Doc. No. 185.  On November 29, 2007, Defendants Norwegian Cruise Line, Ltd., and NCL Corporation Ltd., who are no longer parties, filed a joinder in NCL America's motion.  See Doc. No. 192.  To the extent Plaintiffs assert the same claims against Defendant NCL (Bahamas), Ltd., that entity may, at its option, be deemed to have the benefit of any ruling in this Order in favor of NCL America.  While NCL (Bahamas) may certainly file dispositive motions, this court urges it to restrict itself to matters unique to it and not to relitigate matters addressed in orders preceding its entry into the case.

Intervenor Kassem's Memorandum in Opposition to Defendant Norwegian Cruise Line America's Motion for Summary Judgment (Jan. 24, 2008) ("Intervenor Opp'n to Constructive Discharge Motion").

The court concludes that genuine issues of fact preclude summary judgment as to the constructive discharge claim. Issues of fact also preclude summary judgment with respect to whether Kassem's IIED/NIED claims are time-barred or based on outrageous conduct.  Nor are the IIED/NIED claims preempted by section 301 of the LMRA.  However, the NIED claim fails given the absence of the physical injury required by Hawaii law. Accordingly, the Constructive Discharge Motion is granted with respect to the NIED claim, but denied with respect to all remaining claims.

In a separate motion for summary judgment (the "Actual Discharge Motion"), Defendants argue that (1) the Title VII national origin and discrimination claims should be dismissed because those Plaintiffs-Intervenors who were actually fired have not established a prima facie case of discrimination and because Defendants had a legitimate, nondiscriminatory basis for discharging them; (2) the religious discrimination claim should be dismissed because Defendants had no knowledge of Plaintiffs-Intervenors' religion; and (3) the IIED/NIED claims should be dismissed for the same reasons asserted with respect to Kassem's IIED/NIED claims.  Defendants additionally challenge Plaintiffs-

4

Intervenors' repatriation damage claims and argue that Plaintiff-Intervenor Nagi A. Alziam's damages should be limited based on after-acquired evidence of misconduct by him.

Plaintiff EEOC counter moves for summary judgment,[3] arguing that there is undisputed evidence of discriminatory profiling and pretext.  See EEOC's Counter Motion for Summary Judgment, or in the Alternative, Opposition to All Defendants' Motion for Summary Judgment (Jan. 25, 2008) ("EEOC Opp'n to Actual Discharge Motion").  In the alternative, Plaintiffs argue that there are genuine issues of material fact concerning the Title VII claims and that summary judgment is not warranted on their other claims.  See id.; Plaintiffs-Intervenors' Memorandum Opposition to Defendant Norwegian Cruise Line America's Motion for Summary Judgment (Jan. 24, 2008) ("Plaintiffs-Intervenors Opp'n to Actual Discharge Motion").

The court denies in part and grants in part Defendants' Actual Discharge Motion.  The court concludes that (1) section 301 of the LMRA does not preempt Plaintiffs-Intervenors' IIED/NIED claims, but the NIED claims are barred by the absence

---

[3]  Plaintiff EEOC has also filed a separate eighteen-page document--Objections and Requests to Strike in Response to All Defendants' Concise Statement of Facts In Support of Their Motion for Summary Judgment--which, for all intents and purposes, is an additional opposition to Defendants' concise statement of facts.  See Doc. No. 263.  Local rules do not provide for the filing of such a document.  The court strikes this document. Plaintiffs-Intervenors' Joinder to Plaintiff EEOC's Objections, filed on January 28, 2008, is thus rendered moot.

of physical injury; (2) the collective bargaining agreement bars repatriation damages; and (3) Defendants have demonstrated that they would have terminated Alziam based on after-acquired evidence.  Issues of fact preclude summary judgment on all other claims.  The EEOC's counter motion is denied in its entirety.

In conjunction with Defendants' motions for summary judgment, Defendants have also filed two separate motions for Rule 11 sanctions.  First, Defendants argue that Plaintiffs-Intervenors failed to conduct a reasonable inquiry before filing their state tort claims because these claims are time-barred by Hawaii's two-year statute of limitations.  See Defendants NCL America Inc., Norwegian Cruse Line Ltd., and NCL Corporation Ltd.'s Motion for Rule 11 Sanctions Against Plaintiff-Intervenors and/or Their Counsel (Nov. 27, 2007) ("Motion for Rule 11 Sanctions Against Plaintiffs-Intervenors") at 5.  In their second motion for Rule 11 sanctions, Defendants contend that "sanctions are warranted because the EEOC's and Intervenors' religious discrimination claims are not based on reasonable inquiry and lack evidentiary support."  Defendants NCL America Inc., Norwegian Cruise Line Ltd., and NCL Corporation Ltd.'s Motion for Rule 11 Sanctions Against U.S. Equal Employment Opportunity Commission and/or its Counsel and Plaintiff-Intervenors and/or Their Counsel (Nov. 27, 2007) ("Motion for Rule 11 Sanctions Against Plaintiffs") at 6.  As Defendants are not the prevailing

parties on their underlying motions for summary judgment, the court denies Defendants' motions for Rule 11 sanctions.[4]

II.       BACKGROUND FACTS.

The factual background of this case was summarized in this court's previous order. See Feb. 1, 2008, Order at 9-13. Those facts are incorporated into this order and supplemented as necessary.

From June to July 2004, Plaintiffs-Intervenors worked on NCL America's cruise ship, the Pride of Aloha. Ex. 15 (attached to Actual Discharge Motion). Two unions--the Seafarers International Union ("SIU") and the Seafarers Entertainment and Allied Trades Union ("SEATU")--represented the various employment positions that Plaintiffs-Intervenors held. Declaration of Fay Rawles-Schoch (Nov. 27, 2007)("Rawles-Schoch Decl.") at ¶ 5. SIU and SEATU each has its own collective bargaining agreement ("CBA"), and these CBAs address hiring policies, equal opportunity, terminations, and repatriation. See Exs. 16, 17 (attached to Actual Discharge Motion).

Between July 12 and July 18, 2004, Pride of Aloha employee Eric Tedtaotao allegedly observed a Middle Eastern

---

[4] The court counsels all parties that their eagerness to file unnecessary and meritless motions is trying the court's patience. Plaintiffs' habit of automatically filing counter motions and Defendants' reflexive filing of Rule 11 motions are wasting their clients' time and money. The court urges the parties to rethink their motion strategy.

coworker appear angry, make disparaging remarks about Americans, state that he would be joined by friends soon, and ask about restricted areas of the ship.  Deposition of Eric Tedtaotao (Mar. 17, 2007) ("Tedtaotao Dep.") at 61-75.

On July 18, 2004, allegedly alarmed by this behavior, Tedtaotao reported his observations to Safety Manager Alejandro Mercado and encouraged Mercado to look into the Middle Eastern employees.  Id. at 107-08; Deposition of Alejandro Mercado (Nov. 6, 2007) ("Mercado Dep.") at 69-70.  Shortly thereafter, Tedtaotao resigned.  Mercado Dep. at 70.  Allegedly concerned by the questions regarding the ship's restricted areas, Mercado reported the matter to Surveillance Manager Miguel Pilgram.  Id. at 80-81.  Pilgram in turn gave the information to Security Officer James Conway and Staff Captain David Turner.  Deposition of James Conway (May 14, 2007) ("Conway Dep.") at 78-79.  Later on the evening he learned of the matter, Pilgram used the ship's computer system to search for Middle Eastern new hires and discovered that two Plaintiffs-Intervenors--Nagi Alziam and Muthana Shaibi--matched this description.  Deposition of Miguel Pilgram (Nov. 8, 2007) ("Pilgram Dep.") at 40-44.

On July 19, 2004, Conway saw two male crewmembers on the gangway.  Thinking they were new hires, Conway asked to see their identifications and asked them whether they were supposed to be in orientation.  The two crewmembers allegedly gave

8

inconsistent responses.  Conway Dep. at 82-85.  Conway told Pilgram and Turner about the matter.  Pilgram then gave Conway photographs of Alziam and Shaibi.  Id. at 95, 100-04.  Pilgram confirmed that Alziam and Shaibi were the two men he had spoken with.

Matthew Lewis, Director of Security in Defendants' Miami office, was told of these occurrences and was sent information on Alziam and Shaibi.  Deposition of Matthew Lewis (Nov. 7, 2007) ("Lewis Dep.") at 70-72.  Lewis then contacted FBI Agent George Nau in Miami and asked Nau to check on whether Alziam and Shaibi might pose problems.  Id. at 75-76, 79, 82. Lewis says that on July 21, 2004, Agent Nau notified him that Alziam and Shaibi were "positive matches" in the FBI database, meaning that they were in the FBI computer system.  Id. at 82-83; Declaration of George Nau (Oct. 15, 2007) ("Nau Decl.") at ¶ 9. There is some discrepancy regarding what Agent Nau told Lewis, but Lewis alleges that Agent Nau indicated that Alziam and Shaibi were implicated in money laundering schemes in support of terrorist organizations.  Lewis Dep. at 82-84.  Lewis gave this information to NCL America Executive Vice President Robert Kritzman.  Id. at 86-87.

Meanwhile, Pilgram identified three more crewmembers-- Plaintiffs-Intervenors Ahmed Almraisi, Abdullah Yahia, and Ahmed

Al-Mlhany--who had minor discrepancies in their personnel records.  Ex. 26 (attached to Actual Discharge Motion).

On July 23, 2004, Lewis asked Agent Nau to check into these three additional names.  These three individuals also were "positive matches" in the FBI database.  Lewis Dep. at 172-74.; Nau Decl. ¶¶ 4, 8.  Kritzman was told of this.  Later that afternoon, Lewis, Kritzman, and other NCL personnel held a telephone conference call in which they decided to contact the FBI office in Honolulu.  Lewis Dep. at 99-105.

FBI Agent Joe Norris was contacted in Honolulu.  Agent Norris told Lewis that the Joint Terrorism Task Force ("JTTF") would conduct an investigation onboard the Pride of Aloha on Maui the next day, July 24, 2004.  Id. at 106-07.

Kritzman decided that the identified crewmembers would be deemed to have failed their probation, based on (1) their inquiries about restricted areas, (2) Conway's encounter with the new hires, (3) the "positive matches" in the FBI database, (4) discrepancies in the personnel files, (5) the upcoming JTTF investigation, (6) the high profile of the Pride of Aloha, and (7) the safety of the 3,000 people on the ship.  Deposition of Robert Kritzman (Mar. 15, 2007) ("Kritzman Dep.") at 47-50.

On the morning of July 24, 2004, Kritzman told Turner of the termination decision.  Deposition of David Turner (May 12, 2007) ("Turner Dep.") at 187.  The JTTF boarded the Pride of

Aloha that day and, after being briefed by the ship staff, began an investigation.  Declaration of Joseph Norris (Aug. 26, 2007) ("Norris Decl.") at ¶¶ 7-9.  The JTTF identified individuals to interview, and Conway helped facilitate the process.  Conway Dep. at 122-23.  The JTTF concluded that Plaintiffs-Intervenors posed no security threat and told Plaintiffs-Intervenors that they could return to work.  Deposition of Joseph Garguilo (Mar. 6, 2007) ("Garguilo Dep.") at 39, 50-60.

At the end of its investigation, the JTTF notified ship officials of its findings and told Conway that the JTTF might need to conduct a further investigation of Plaintiffs-Intervenors.  Conway told the JTTF that Plaintiffs-Intervenors had already been discharged for failing probation.  Id. at 61-64. Conway was unclear about how Plaintiffs-Intervenors would return home.  Id. at 66; Norris Decl. at ¶¶ 17-18.  The JTTF investigators ran into Plaintiffs-Intervenors on the pier and, upon learning that they were without transportation, helped arrange transportation for Plaintiffs-Intervenors to the airport. Garguilo Dep. at 70-71.

Plaintiff-Intervenor Kassem—also a Muslim Yemeni—had not been investigated by the JTTF.  Deposition of Samed Kassem (Sept. 5, 2007) ("Kassem Dep.") at 15.  Up until July 24, 2004, Kassem had not experienced any animosity based on his national origin or religion, but, on the morning of July 24, 2004, he felt

11

that his coworkers were treating him differently.  According to Kassem, a coworker said he thought the ship had fired all the "terrorists" and asked Kassem what he still was doing on the ship.  It was only when he learned that a number of Muslim Yemeni crewmembers had been fired that Kassem could place the comments in context.  Id. at 67-69.  Kassem says that, throughout the day, he felt isolated and ostracized, as coworkers allegedly avoided Kassem and directed slurs toward him.  Id. at 70.  Kassem says he was called a "terrorist" and was told to go back to his country by coworkers gathered in groups.  Id. at 77-79.

Kassem says he complained to someone he believed was a supervisor.  That person told Kassem to return to work. According to Kassem, when the slurs and comments continued, he concluded that nothing was going to be done to help him.  Id. at 80-83.  Because these comments were directed at Kassem by groups of people, Kassem claims to have felt physically threatened and unable to defend himself both physically and verbally.  Id. at 157, 159.

The next morning, July 25, 2004, Kassem resigned. Although Kassem told NCL America that he was quitting because his daughter was sick, Kassem says this was an excuse he used so he could leave the ship immediately.  Id. at 84.  Kassem says he wanted to leave the ship quickly before it left Honolulu because

he was concerned about being on the ship while it was out at sea. Id. at 93.

Two weeks later, Kassem tried to come back to work with NCL America, hoping that things had calmed down.  Id. at 86, 89.

On August 1, 2004, JTTF agents Norris and Garguilo went back to the Pride of Aloha to resolve remaining security concerns.  Norris Decl. at ¶ 20.  During this investigation, members of the U.S. Coast Guard questioned Conway on the reporting protocols for terminations based on security concerns. Id. at ¶ 23.  Conway asserted that Plaintiffs-Intervenors were terminated because they failed probation and/or posed security concerns.  Id.  Agent Norris also interviewed Mercado and Pilgram.  Mercado denied that Tedtaotao had reported to Mercado that the Middle Eastern crewmembers had asked him questions about restricted areas.  Pilgram could not recall what Mercado had told him about whether or not the crewmembers had asked Tedtaotao questions.  Id. at ¶¶ 24-25.

After concluding its investigation, the JTTF considered looking into whether there was evidence of false reporting by NCL America.  Garguilo Dep. at 79-81.

III.      LEGAL STANDARDS.

          The summary judgment and Rule 11 sanctions standards
are set forth in this court's previous order.  See Feb. 1, 2008,
Order at 6-9.  Those standards are incorporated herein by
reference.

IV.       ANALYSIS.

          There are currently two defense motions for summary
judgment before the court--one pertaining to Kassem's claim of
constructive discharge and the other pertaining to Plaintiffs-
Intervenors' claims of actual discharge.  Each motion also
addresses state claims, with the state claim being identical in
both motions.  The court first analyzes the Title VII claim
concerning Kassem's constructive discharge claim, then separately
examines the other Plaintiffs-Intervenors' Title VII claims.
Defendants appear to be challenging the § 1981 claims on the same
grounds as the Title VII claims.  The state claims of all
Plaintiffs-Intervenors are examined together in the discussion
below.

          A.   Defendants' Constructive Discharge Motion.

          To survive summary judgment on a constructive discharge
claim, a plaintiff must show a triable issue of fact as to
whether a reasonable person would have felt compelled to quit
"because of intolerable and discriminatory working conditions."
Steiner v.  Showboat Operating Co., 25 F.3d 1459, 1465 (9th Cir.

14

1994); see also Draper v. Coeur Rochester, Inc., 147 F.3d 1104 (9th Cir. 1998) ("In such cases the individual has simply had enough; [the individual] can't take it anymore."). The issue of whether working conditions were so intolerable that they warranted resignation is usually a question best left to the factfinder. Thomas v. Douglas, 877 F.2d 1428, 1434 (9th Cir. 1989). Generally, "a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge." Watson v. Nationwide Ins. Co., 823 F. 2d 360, 361 (9th Cir. 1987). To prove constructive discharge, the plaintiff must show "aggravating factors" or a continuous pattern of discrimination. Id.

Constructive discharge claims can be brought based either on an adverse employment action or the existence of a hostile work environment. See Penn. State Police v. Suders, 542 U.S. 129, 140 (2004). To prevail on a summary judgment motion involving a hostile work environment claim, the plaintiff must show that there is a triable issue as to whether the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)) (internal quotation marks omitted)). Courts look to evidence of both subjective and objective hostility. Id.

Subjective hostility concerns the plaintiff's subjective perception that the environment was hostile.  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993).  Objective hostility-- whether a reasonable person would find the environment hostile-- can be determined by looking at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Id.</u> at 23.

"Where a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job."  <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 930 (9th Cir. 2000).  Constructive discharge requires some "aggravating factors" that would compel a reasonable person to leave.  <u>See</u> <u>id.</u>

Defendants argue that they are entitled to summary judgment because the circumstances surrounding Kassem's resignation do not, as a matter of law, establish either a hostile work environment or a constructive discharge claim.[5]

_____

[5]  At the hearing, Defendants also argued that Kassem's constructive discharge claim was never administratively exhausted.  NCL America failed to raise this argument in its moving papers.  Moreover, a similar argument will be addressed in connection with Plaintiff EEOC's Motion for Partial Summary

Constructive Discharge Motion at 12.  Defendants submit that Kassem left on his own accord, and that a few comments made by crewmembers over about eighteen hours are insufficient to sustain a claim for constructive discharge.  Id. at 8-11.

The problem with Defendants' position is that it ignores the context of the comments.  Six other crewmembers of the same national origin and religion as Kassem had recently been fired following an FBI investigation.  This could have left Kassem understandably feeling isolated or at least possibly unwelcome as a Yemeni Muslim.  In light of the circumstances, there is a genuine issue of fact regarding the existence of a hostile work environment.  There is some evidence of both subjective and objective hostility.  Kassem testified to fearing for his personal safety, especially because he felt outnumbered and defenseless.  Moreover, objective hostility can be inferred by the allegedly continuous harassment and insults Kassem faced throughout the day, the alleged lack of supervisory intervention to address the reported harassment, as well as the allegedly threatening nature of taunts by groups of crewmembers.  The court thus concludes that there is at least an issue of fact regarding whether there was a hostile work environment.

---

Judgment Against All Defendants, set for hearing on February 25, 2008.  See Doc. No. 180.  The court does not here rule on that issue.

The court also concludes that Kassem has presented some evidence of "aggravating factors" that could sustain a claim for constructive discharge.  Defendants contend that harassment over an eighteen-hour period does not constitute an aggravating factor.  Nevertheless, this harassment was allegedly continuous and occurred on a ship, which is distinct from some other working situations because it requires Kassem to spend both his working and leisure time in the same environment surrounded by the same individuals.

In <u>Watson</u>, the Ninth Circuit concluded that three instances of differential treatment occurring over a one-month period constituted evidence of aggravating factors sufficient to survive summary judgment.  The plaintiff in <u>Watson</u> had received allegedly false performance reports and was subjected to abusive and harassing comments from coworkers.  <u>Watson</u>, 823 F. 2d at 361-62.  Here, although the harassment took place over a much shorter period of time, the nature of the harassment is more severe than that faced by the <u>Watson</u> plaintiff.  Further, Kassem says he felt isolated, as insults were allegely directed toward him by groups of other crewmembers.  The record contains sufficient evidence of aggravating factors to proceed to trial.  <u>See</u> <u>e.g.</u>, <u>Bergene v. Salt River Project Agric. Improvement and Power Dist.</u>, 272 F.3d 1136, 1144 (9th Cir. 2001) (noting that the plaintiff's isolation as the only woman supervisor, as well as "demeaning and

threatening comments" made by coworkers, constituted aggravating factors).

In light of all the circumstances surrounding Kassem's resignation, there are issues of fact regarding whether a reasonable person in Kassem's position would have felt compelled to leave.  Defendants' Constructive Discharge Motion is denied with respect to the constructive discharge claim.

B.   Defendants' Actual Discharge Motion.

To establish a prima facie case of unlawful discrimination, a plaintiff must show that "(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." McGinest, 360 F.3d at 1122 n.16 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)); Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123 (9th Cir. 2000).  The initial burden of demonstrating a prima facie case is not onerous.  Sischo-Nownejad v. Merced Cmty. College Dist., 934 F.2d 1104, 1110-11 (9th Cir. 1991) ("evidence may be direct or circumstantial, and . . . the amount that must be produced in order to create a prima facie case is 'very little'"), superseded by statute on other grounds as recognized in Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027 (9th

Cir. 2005) (quoting <u>Lowe v. City of Monrovia</u>, 775 F.2d 998, 1009 (9th Cir. 1985)).

"The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action." <u>McGinest</u>, 360 F.3d at 1122 n.16.  If the employer carries this burden, the plaintiff must show that the defendant's reason was a pretext for discrimination.  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  The plaintiff may do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> (citing <u>McDonnell Douglas</u>, 411 US. at 804-05).

"As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." <u>Chuang</u>, 225 F.3d at 1124.  "The ultimate question is one that can only be resolved through a searching inquiry--one that is most appropriately conducted by a factfinder, upon a full record." <u>Schnidrig v. Columbia Mach., Inc.</u>, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotations omitted).

1.   <u>Prima Facie Case.</u>

The Ninth Circuit has made it clear that, on a summary judgment motion, the amount of proof a plaintiff needs to establish a prima facie case is "minimal and does not even need

to rise to the level of a preponderance of the evidence." <u>Wallis v. J.R. Simplot Co.</u>, 26 F.3d 885, 889 (9th Cir. 1994). Defendants argue that Plaintiffs cannot make out a prima facie case based on their religious discrimination claim because there is no evidence that Defendants knew that Plaintiffs-Intervenors were Muslim or, indeed, had any religious affiliation.  Actual Discharge Motion at 30.  Defendants also contend that Plaintiffs-Intervenors have failed to make out a prima facie case based on their national origin discrimination claim because they have failed to identify similarly situated individuals who treated more favorably.  <u>Id.</u> 24-25.  The court is not persuaded by either argument.  It appears to the court that Plaintiffs-Intervenors' claims of discrimination based on national origin and religion are interrelated.  The court therefore analyzes the claims together.

> a.    National Origin and/or Religious Discrimination.

Defendants note that Kritzman, when making his discharge decision, did not have information on the Plaintiffs-Intervenors' religious affiliation.  <u>Id.</u> at 30-32.  There is no contention that Defendants were unaware of Plaintiffs-Intervenors' Middle Eastern origin.  In light of the circumstances of this case, the court concludes that there is at least an issue of fact regarding whether Defendants inferred

21

Plaintiffs-Intervenors' Muslim religion based on their national origin.

As the Ninth Circuit has recognized, "where two bases for discrimination exist, they cannot be neatly reduced to distinct components." Lam v. Univ. of Hawai'i, 40 F.3d 1551, 1562 (9th Cir. 1994).

Courts have previously recognized the overlap between racial and national origin discrimination. "[R]ace and national origin discrimination may present identical factual issues when a victim is 'born in a nation whose primary stock is one's own ethnic group.'" Sinai v. New England Tel. And Tel. Co., 3 F.3d 471, 475 (1st Cir. 1993) (quoting Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 614 (1987) (Brennan, J., concurring)); see also Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003) ("Where the line between national origin discrimination and racial discrimination is difficult to trace, courts have warned that '[a]n attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate.'") (quoting Bullard v. OMI Georgia, Inc., 640 F.2d 632, 634-35 (5th Cir. 1981)).

In Sinai, the plaintiff alleged discrimination on the basis of his race, Jewish/Hebrew, as well as national origin, Israel. The defendants objected to the jury finding that the plaintiff had suffered racial discrimination when the only

evidence of discrimination was based on disparaging remarks about the plaintiff's Israeli background.  The Second Circuit disagreed, concluding that the jury could infer that "Israel is one of those countries in which the populace is composed primarily of a particular race."  Id. at 474.  The court thus concluded that the defendant discriminated against the plaintiff on the basis of his race when disparaging remarks were made only about his national origin.

Similarly, courts are beginning to recognize the overlap between religion and national origin.  In Sasannejad v. Univ. of Rochester, 329 F. Supp. 2d 385, 391 (W.D.N.Y. 2004), the court recognized that, in certain circumstances, a claim based on national origin discrimination "may be so interrelated" with a claim based on religious discrimination that the two are "indistinguishable."  The plaintiff was born in Iran and was a nonpracticing Muslim.  In his EEOC charge, the plaintiff specified only national origin discrimination and not religious discrimination.  The defendants objected that there had been no administrative exhaustion of the religious discrimination claim.  The court concluded that the claims were "sufficiently blurred" and "reasonably related to one another" because the religious demography of Iran was ninety-eight percent Muslim.

In Salem v. Heritage Square Inc., 2007 WL 2555513 (N.D. Cal. 2007), the plaintiff was Middle Eastern and an Orthodox

Catholic.  The plaintiff alleged employment discrimination and a hostile environment on the basis of her gender, Middle Eastern ethnicity, and her "purported religion" of Muslim.  Even though the plaintiff was Catholic, she claimed that her colleagues may have believed that she was Muslim.  Id. at *8.  Most of the comments that the plaintiff presented as evidence of discrimination were limited to her Middle Eastern ethnicity, rather than her "purported" Muslim religion.  The court, nonetheless, concluded that there were triable issues of fact as to whether the plaintiff's colleagues were aware of her religion. The court denied the defendant's motion for summary judgment, noting that all facts relevant to the plaintiff's claims of gender, ethnic, and religious discrimination should be considered together.  Id. at *9.

Here, Defendants knew that Plaintiffs-Intervenors were Yemeni.  In addition, some of Kritzman's purported reasons for discharging Plaintiffs-Intervenors were based on security concerns.  Kritzman Dep. at 47-50.  It would not be a far inferential leap for this court to conclude that, even if Kritzman had no knowledge of Plaintiffs-Intervenors' actual religion, there is at least a question of fact as to whether Kritzman inferred their religion based on their Yemeni origin.

In this post-September 11 world, national origin and religion have often become conflated in media reports, especially

with regard to issues of terrorism.  In <u>Sasannejad</u>, the court--
citing the World Factbook report issued by the Central
Intelligence Agency--noted that Muslim was the dominant religion
in Iran, and thus, claims of religious and national origin
discrimination were interrelated.  Similarly, the 2008 World
Factbook issued by the Central Intelligence Agency states that
the primary religion of Yemen is Muslim.  <u>See</u> Central
Intelligence Agency, The World Factbook 2008, found at
http://www.cia.gove/cia/publications/factbook/geos/ym.html (last
updated Feb. 12, 2008).  It would thus not be surprising if
Defendants inferred that Plaintiffs-Intervenors were Muslim based
on their Yemeni origin.  The court denies Defendants' summary
judgment on the religious discrimination claim.

      b.   <u>Similarly Situated Individuals.</u>

     In Title VII discrimination claims, a plaintiff must
show that similarly situated individuals outside of his protected
class were treated more favorably than he was.  <u>Chuang</u>, 225 F.3d
at 1123.  "[I]ndividuals are similarly situated when they have
similar jobs and display similar conduct."  <u>Vasquez v. City of
Los Angeles</u>, 348 F.3d 634, 641 (9th Cir. 2003).  Thus, Defendants
argue that, to prevail on their claim, Plaintiffs must show that
other non-Yemeni or non-Muslim employees who engaged in similar
conduct were not terminated.  <u>See</u> <u>Rutenschroer v. Starr Seigle
Commc'ns, Inc.</u>, 484 F.2d 1144, 1155 (D. Haw. 2006) ("For the

purpose of this analysis, Plaintiff must prove that employees with a similar work schedule that were not black, not African-American, or not female received better treatment.")(citing Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003)).

Defendants argue that Plaintiffs have failed to establish a prima facie case of discrimination because "they cannot identify any similarly-situated individuals outside the protected class, much less that such individuals were treated more favorably."  Actual Discharge Motion at 25.  Defendants claim that Plaintiffs have failed to identify others who engaged in a pattern of "similar conduct"--asking about restricted areas of the ship, lying to ship officers, sharing various associations, and being subject to FBI investigation or appearing in the FBI database—-but were treated more favorably.

The Ninth Circuit, however, has rejected such an argument at the summary judgment stage.  When a plaintiff alleges discrimination based on membership in a protected class, the allegation can be "liberally construed" as an allegation of being "treated differently from others similarly situated."  Perugini v. Safeway Stores, Inc., 935 F.2d 1083, 1086 (9th Cir. 1991).  If Defendants in the present case are arguing that Plaintiffs have failed to state a Title VII claim, that was a subject for a Rule 12(b)(6) motion, not a summary judgment motion.  See id.

More importantly, Defendants' argument is far too narrowly framed.  Defendants looked into Plaintiffs-Intervenors' personnel files and learned of Plaintiffs-Intervenors' inclusion in the FBI database only as a result of having <u>first</u> performed a search into NCL America's own database for <u>only</u> "Middle Eastern" hires.  Pilgram Dep. at 44.  Thus, to identify similarly situated individuals, Plaintiffs would only need to identify other employees who had asked about restricted areas or lied to ship officers, but who were not then investigated or fired.  There is a factual dispute created by Mercado's denial that Tedtaotao even told him about restricted area questions in the first place.  Thus, Defendants' argument may be limited to a comparison with other crewmembers who told lies.  Defendants do not appear to be claiming that they fired every crewmember who ever said something untrue.  The court notes that not all lies would be likely to be documented, and Plaintiffs would likely be hard pressed to get other crewmembers to admit to having told lies.  Given Defendants' misframing of their "similarly situated" argument, summary judgment is not warranted on that issue.

> 2.   Defendants' Legitimate, Nondiscriminatory
>      <u>Reason and Evidence of Pretext.</u>

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "produce admissible evidence which would allow the trier of fact rationally to

conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257.

If a defendant provides a legitimate, nondiscriminatory reason, the plaintiff can prove pretext either directly by showing that the employer was more than likely motivated by a discriminatory purposes or, indirectly, by showing that the defendant's nondiscriminatory is not credible "because it is internally inconsistent or not believable." Chuang, 225 F.3d at 1127; Godwin v. Hunt Wesson Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).

Direct evidence proves discriminatory animus without "inference or presumption." Godwin, 150 F.3d at 1221; see also id. (citing cases of sexual stereotyping and racial slurs as constituting direct evidence). Very little direct evidence showing discriminatory intent is needed to survive summary judgment. Bergene, 272 F.3d at 1142; Blue v. Widnall, 162 F.3d 541, 546 (9th Cir. 1998). Indirect, or circumstantial, evidence, however, needs to be "specific and substantial." Bradley v. Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 1996). Nevertheless, a "plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered

28

reasons." <u>Chuang</u>, 225 F.3d at 1127 (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146 (2000)).

Defendants argue that even if Plaintiffs have established a prima facie case, Defendants have set forth a legitimate, nondiscriminatory reason for terminating Plaintiffs-Intervenors: "a <u>bona</u> <u>fide</u> interest in ship security." Actual Discharge Motion at 27. Kritzman says he was concerned about the ship's security and discharged Plaintiffs-Intervenors because of: (1) their questions about restricted areas of the ship; (2) Conway's suspicious encounter with two Plaintiffs-Intervenors; (3) "positive matches" in the FBI database; (4) discrepancies in personnel records; (5) the JTTF investigation; (6) Pride of Aloha's status as a U.S.-flagged ship; and (7) concern for 3,000 lives.

Plaintiffs respond that (1) Defendants targeted Middle Eastern crewmembers in their investigation, (2) Defendants based their discharge decision on FBI information that allegedly does not exist, (3) the decision to discharge was made before the JTTF concluded its investigation, and (4) Defendants relied on the report of Tedtaotao, whose credibility Plaintiffs challenge. EEOC Opp'n to Actual Discharge Motion at 24-40.

Questions of fact preclude summary judgment on the above issues. It appears to the court that these issues turn on witness credibility. The matter is appropriate for trial.

29

C.   <u>IIED and NIED State Claims.</u>

Defendants challenge Plaintiffs-Intervenors' state tort claims based on: (1) section 301 preemption, (2) the running of the statute of limitations, and (3) the failure to prove essential elements of the state torts.

1.   <u>Preemption by Section 301 of the LMRA.</u>

For purposes of this court's jurisdiction over the IIED/NIED claims, the court must first determine whether these claims are preempted by section 301 of the LMRA.  <u>Livadas v.Bradshaw</u>, 512 U.S. 107, 121-122 (1994).  Section 301 provides: "Suits for violation of contracts between an employer and a labor organization . . . may be brought in any district court of the United States having jurisdiction of the parties."  29 U.S.C. § 185(a).  Under section 301, courts apply substantive federal law to labor contract disputes, and federal courts are authorized to fashion a body of federal common law to govern disputes arising out of labor contracts.  <u>Textile Workers v. Lincoln Mills</u>, 353 U.S. 448, 456 (1957).  "As a result of this broad federal mandate, the Supreme Court has explained, the 'preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization.'"  <u>Burnside v. Kiewit Pac. Corp.</u>, 491 F.3d 1053, 1059 (9th Cir. 2007) (quoting <u>Franchise Tax Bd. v. Constr. Laborers Vacation Trust</u>, 461 U.S. 1, 23 (1983)).

This court's inquiry thus focuses on whether the IIED/NIED claims are really claims based on a contract between an employer and a union.  That is, if the IIED/NIED claims involve rights that Plaintiffs-Intervenors have solely because of a CBA, those claims are preempted.  Even if the claims involve rights conferred by state law, independent of a CBA, the claims are preempted if they are "substantially dependent" on analysis of a CBA.  See id. (citing Caterpillar Inc., v. Williams, 482 U.S. 386, 394 (1987)).

Defendants argue that Plaintiffs-Intervenors' tort claims are preempted by section 301 because the "outcome depends on an analysis of the terms of the collective bargaining agreement."  Actual Discharge Motion at 36.  Citing to Miller v. AT&T Network Sys., 850 F.2d 543 (9th Cir. 1988), Defendants contend that IIED and NIED claims depend on the outrageousness and unreasonableness of the challenged conduct, and such conduct must be evaluated in reference to the relationship between Defendants and Plaintiffs-Intervenors: "Because the tort requires inquiry into the appropriateness of the defendant's behavior, the terms of the CBA can become relevant in evaluating whether the defendant's behavior was reasonable."  Id. at 550.  Defendants point out that the CBAs address hiring practices, equal opportunity, management prerogatives and termination of employees.  Actual Discharge Motion at 38.

Under Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985), this court turns to "whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.  If the state tort law purports to define the meaning of the contract relationship, that law is pre-empted." Id. at 213.   "[T]he need to interpret the CBA must inhere in the nature of the plaintiff's claim.  If the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the CBA in mounting a defense." Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 691 (9th Cir. 2001). Thus, "a claim is not preempted if it poses no significant threat to the collective bargaining process and furthers a state interest in protecting the public transcending the employment relationship." Young v. Anthony's Fish Grottos, Inc., 830 F.2d 993, 1001 (9th Cir. 1987).

The Ninth Circuit has noted that "[s]ection 301 preemption of intentional infliction/outrage claims is a thorny area; [the Ninth Circuit has] previously acknowledged its difficulty and the uphill battle a plaintiff typically faces to explain why the tort claim is not being used to alter the terms agreed to under the CBA, or sidestep its grievance procedures." Humble v. Boeing Co., 305 F.3d 1004, 1012 (9th Cir. 2002).

In Humble, the court provided two general principles for determining when section 301 preempts IIED/NIED claims.

"First, if the CBA specifically covers the conduct at issue, the claim will generally be preempted."  As an example, the court discussed assignment to work duties.  Second, the Ninth Circuit noted that the claims might not be preempted even if the CBA covered the conduct if the IIED/NIED claims were "tacked on to the violation of a separate specific non-negotiable state statute, the violation of which always rises to the level of outrageousness."  Id. at 1013-14.  Thus, the court has found no preemption when the conduct violated a statutory ban on the use of two-way mirrors or constituted an assault and battery.  Cramer, 255 F.3d at 697; Galvez v. Kuhn, 933 F.2d 773, 777 (9th Cir. 1991); see also id. ("Here, in contrast, [the plaintiff's] cause of action can be evaluated without interpreting the CBA because the acts alleged would violate state law irrespective of the identity of the wrongdoer or of his victim.  They are claims alleging violation of a duty owed to all citizens.").

Nonnegotiable state rights independent of any right established by CBAs are clearly not preempted.  Ramirez v. Fox Television Station, Inc., 998 F.2d 743, 748 (9th Cir. 1993).  The Ninth Circuit has been clear that the right to be free from discrimination recognized under state law is nonnegotiable because it cannot be bargained away by private contract.  See id. (recognizing that claims brought under the California Fair

Employment and Housing Act[6] are not preempted by section 301); <u>see also</u> <u>Cook v. Lindsay Olive Growers</u>, 911 F.2d 233, 240 (9th Cir. 1990) ("[T]he right not to be discriminated against on the basis of religion cannot be removed by private contract.").

Hawaii has just such anti-discrimination statutes. Hawaii's Employment Practices Act declares that it is unlawful for "any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment because of race, sex, age, religion, color, ancestry, handicapped status, or arrest and court record." Haw. Rev. Stat. § 378-2.  To the extent the IIED/NIED claims derive from Plaintiffs-Intervenors' section 378-2 claims, they are not preempted.

The Ninth Circuit's decision in <u>Perugini</u> is particularly helpful here.  In <u>Perugini</u>, 935 F.2d 1083, the plaintiff brought suit against her employer under Title VII, alleging gender discrimination, as well as NIED/IIED.  The plaintiff requested lighter work assignments given her pregnancy. Instead of accommodating the plaintiff, her supervisors required

---

[6] Cal. Gov't Code § 12940(a) states that it is unlawful for "an employer, because of the race, religious creed, color, national origin . . . to bar or discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

that she present a doctor's note.  Even when the plaintiff

complied, her request was denied.  Her supervisors also subjected

her to verbal harassment regarding her pregnancy.  The

plaintiff's pregnancy was complicated, and she lost her child.

Id. at  1085.

The Ninth Circuit identified two bases for the

plaintiff's IIED/NIED claims: the employer's refusal to reassign

the plaintiff to a lighter work assignment and the defendant's

harassment based on the plaintiff's gender and pregnancy.  Id. at

1088.  The court found the plaintiff's IIED/NIED claims based on

her request for lighter work assignments preempted by section

301, as those claims depended on interpretation of the CBA.

"[I]f [the defendant's] managerial freedom is not constrained in

any material way by the CBA, a rational jury could not find that

[the defendant's] conduct" was outrageous.  Id.

By contrast, the court concluded that the IIED/NIED

claims based on the defendant's "on-the-job harassment" did not

require reference to the CBA because the CBA did not "govern the

offending behavior," and such claims depended solely on a

"factual inquiry into the conduct and motivation of the

employer."  Id.

Plaintiffs-Intervenors' IIED/NIED claims are analogous

to the harassment claims brought in Perugini.  Plaintiffs-

Intervenors' IIED/NIED claims are premised on a violation of Haw.

Rev. Stat. § 378-2, which provides a nonnegotiable state right. The alleged conduct at issue involves discrimination on the basis of national origin and religion; assessing this alleged conduct does not require reference to the CBA.  Because the court does not need to interpret the labor agreement to determine whether Plaintiffs-Intervenors were distressed by discrimination based on their national origin and/or religion, the IIED/NIED claims are not preempted.  See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 413 (1988); see also Foster v. Richardson, 843 F. Supp. 625, 629 (D. Haw. 1994) (concluding that state claims based on gender discrimination and retaliatory discharge are not preempted because such rights are "fully independent of any collective bargaining agreement").

            2.   Statute of Limitations.

      "[A]n action for the recovery of compensation for damage or injury to persons or property shall be instituted within two years after the cause of action accrued."  Haw. Rev. Stat. § 657-7.  The two-year limitations period applies to claims for emotional distress filed in federal court.  Linville v. Hawaii, 874 F. Supp. 1095, 1104 (D. Haw. 1994).

      Defendants argue that the IIED/NIED claims are time-barred because the time began to run on the date of discharge (July 24, 2004), and Plaintiffs-Intervenors did not file their complaint until November 2006.  See Actual Discharge Motion at

33-34.  Plaintiffs-Intervenors respond that the discovery rule applies, and that the statute of limitations did not begin to run until Plaintiffs-Intervenors realized the causal connection between Defendants' acts and the alleged distress.  See Plaintiffs-Intervenors Opp'n to Actual Discharge Motion at 32-33; Plaintiff-Intervenor Opp'n to Constructive Discharge Motion at 9-10.

Under the discovery rule, "a cause of action accrues when the plaintiff discovers, or reasonably should have discovered, the elements giving rise to the claim."  Dunlea v. Dappen, 83 Haw. 28, 33, 924 P.2d 196, 201 (Haw. 1996), overruled in part on other grounds; see also Hays v. City and County of Honolulu, 81 Haw. 391, 393, 917 P.2d 718, 720 (Haw. 1996) (cause of action accrues when "the plaintiff knew or should have known" of the causal connection between the defendant's conduct and the plaintiff's harm).  The discovery rule is not restricted to medical malpractice or personal injury claims.  See, e.g., Hays, 81 Haw. 397-98, 917 P.2d at 724-25 (listing the factual situations in which the discovery rule has been applied); Basque v. Yuk Lin Liau, 50 Haw. 397, 398, 441 P.2d 636, 637-38 (Haw. 1968) (applying the statute of limitations discovery rule to cases involving injury to real property).

In Dunlea, the plaintiff had allegedly been sexually abused as a child by her father between 1961 and 1964.  In 1964,

the plaintiff reported the rapes to state authorities and was removed from her father's custody.  In 1991, after speaking with her father about the abuse, the plaintiff suffered "a severe emotional reaction," which prompted her to begin therapy. Shortly after, in 1992, the plaintiff sued her father for damages suffered as a result of the abuse.  The plaintiff alleged that she had suffered depression and shame throughout her life, but it was only through therapy that she discovered that these psychological harms had been caused by her father's sexual acts. Id. at 198-99, 30-31.  The trial court dismissed the claim, concluding that it was barred by the two-year statute of limitations for personal injury actions under Haw. Rev. Stat. § 657-7 because the action accrued at the time of the injury. The trial court declined to apply the discovery rule.  See id. at 199, 31.  The Hawaii Supreme Court reversed, applying the discovery rule and concluding that there was an issue of fact regarding when the plaintiff discovered, or should have discovered, that the alleged sexual abuse was the cause of her psychological harms.  Id. at 204, 36.

Similarly, in Guillermo v. Hartford Life & Accident Ins. Co., 986 F. Supp. 1334 (D. Haw. 1997), decided by Judge David Alan Ezra of this district, the court applied the discovery rule to IIED/NIED claims.  In Guillermo, the plaintiffs brought IIED/NIED claims based on the defendant's termination of a life

insurance policy.  The policy was terminated in 1992, and the

plaintiffs brought suit in 1996.  Id. at 1335-36.  The defendants

argued that the IIED/NIED claims were barred by the two-year

statute of limitations.  The plaintiffs argued that, although

they knew of the policy termination in 1992, it was not until

years later that they suffered distress from the termination of

the policy, given the defendants' refusal to reinstate the

policy.  In applying the discovery rule, the court concluded that

there was an issue of fact as to when the plaintiffs "knew the

causal connection between their emotional distress and [the

defendant's] actions":

> [U]nder the discovery rule, a cause of action
> accrues when the plaintiff knew or should
> have known of the causal connection between
> the defendant's action and the damage done.
> While it is clear that [the defendant's]
> action in terminating the policy was known by
> [the p]laintffs in 1992, it is still unclear
> when [the p]laintiffs actually suffered
> emotional distress, and when they connected
> their distress with [the defendant's]
> actions.

Id. at 1337.

Defendants cite to the deposition testimony of

Plaintiff-Intervenor Al-Mlhany to demonstrate that Plaintiffs-

Intervenors discovered their tort claims on the date of

discharge.  Defendants' Reply at 13-14.  Specifically, Al-Mlhany

testified that, on the day of discharge, he felt shocked and

humiliated and that Plaintiffs-Intervenors discussed bringing a

claim against the company on the basis of religious and/or national origin discrimination.  See Deposition of Ahmed Al-Mlhany (April 30, 2007) at 8-10.

Although Plaintiffs-Intervenors were outraged at being terminated, they may not have realized the causal connection between Defendants' actions and their own outrage.  Plaintiffs-Intervenors might have thought that the FBI had called for their terminations.  If the FBI were responsible, Plaintiffs-Intervenors would not have had a basis for bringing IIED and/or NIED claims against Defendants.  See, e.g., Garguilo Dep. at 68 ("[W]e [the JTTF] walked off the ship . . . and saw three or four of the crewmen that we had just spoken with sitting on the pier with their luggage.  And we walked up to them and said what's -- what's happened?  And they said, well, they fired us.  And we said, well, why?  Well, we were -- apparently because you were talking to us.").[7]

At the hearing, Defendants argued that Garguilo's deposition testimony demonstrates that Plaintiffs-Intervenors were aware that the FBI had concluded that Plaintiffs-Intervenors posed no security concern.  See id. at 59-60.  Thus, Defendants argue, Plaintiffs-Intervenors should have attributed their discharge solely to Defendants on the date of discharge.  But the

---

[7]  Defendants object to Garguilo's statement on the basis of hearsay.  Garguilo's statement is not considered for its truth but, instead, as evidence of the declarant's state of mind.

FBI also notified Plaintiffs-Intervenors of the possibility of a further investigation if additional information were received. Id. at 60.  This statement suggested that the FBI might still be involved.  There is sufficient ambiguity in the evidence to establish a question of fact as to whether Plaintiffs-Intervenors knew or should have known that Defendants were to blame for the distress.  There is a triable issue of fact as to when Plaintiffs-Intervenors discovered the cause of their alleged emotional distress.

        3.   Elements of IIED/NIED Claims.

           a.   IIED.

The elements of an IIED claim are "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another."  Hac v. Univ. of Hawaii, 102 Haw. 92, 107, 73 P.2d 46, 61 (Haw. 2003).  To prevail on a claim of IIED, the defendant's acts must be "unreasonable," which means that they are without justification and beyond the standards of decency.  See Shoppe v. Gucci America, Inc., 94 Haw. 368, 397, 14 P.3d 1049, 1068 (Haw. 2000).  As a threshold matter, the court must determine whether the alleged acts are sufficiently unreasonable or outrageous to sustain a claim for IIED.  When reasonable minds could differ, the question is for the jury.  See id.

Defendants argue that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to sustain a claim for IIED.  Actual Dicharge Motion at 35 (quoting Bragalone v. Kona Coast Resort Joint Venture, 866 F. Supp. 1285, 1294 (D. Haw. 1994)).  In Bragalone, the plaintiff's supervisor allegedly caused emotional distress by yelling at the plaintiff, giving confusing work instructions, interrupting her while speaking, and telling her she should not question his authority.  See Bragalone, 866 F. Supp. at 1294. The court concluded that, although the comments were "distasteful," they were insufficient to support a claim for IIED.  Similarly, in Ross v. Stouffer Hotel Co. (Hawai'i) Ltd., Inc., 76 Haw. 454, 465, 879 P.2d 1037, 1048, the Hawaii Supreme Court found that an employer's decision to terminate an employee pursuant to a work policy--without evidence that the manner in which it was done or the motive for the termination was unreasonable--was insufficient to support a claim for IIED.

Plaintiffs-Intervenors contend that they were fired because of Defendants' discriminatory animus, that they were discharged without an explanation and told to gather their belongings and to leave the ship, and that they were left without either transportation or money to return home.  Garguilo Dep. at 70-71.  Under such circumstances, the court concludes that there

42

is a question of fact as to whether the discharge and manner of discharge constituted outrageous and reckless conduct.

> b.   NIED.

Defendants argue that Plaintiffs-Intervenors' NIED claims should be dismissed because there is no evidence of physical injury.  Actual Discharge Motion at 38.  Plaintiffs-Intervenors respond that, in Hawaii, an NIED claim can be brought when there has been no physical injury.  Plaintiffs-Intervenors Opp'n to Discharge Motion at 34.

Hawaii law requires that an NIED claim be supported by a physical injury:

> (a) No party shall be liable for the negligent infliction of serious emotional distress or disturbance if the distress or disturbance arises solely out of damage to property or material objects.

> (b) This section shall not apply if the serious emotional distress or disturbance results in physical injury to or mental illness of the person who experiences the emotional distress or disturbance.

Haw. Rev. Stat. § 663-8.9.

Plaintiffs-Intervenors cite to Guth v. Freeland, 96 Haw. 147, 156, 28 P.3d 982, 990 (2001), for the proposition that not all NIED claims require physical injury.  Guth dealt with the negligent handling of a corpse.  In permitting an NIED claim in that context, the Hawaii Supreme Court was carving out a narrow exception to the general requirement of physical injury for NIED

43

claims.  See e.g., Ross, 76 Haw. at 465, 879 P.2d at 1048.

Accepting Plaintiffs-Intervenors' broad contention would entirely

negate the physical injury requirement imposed by statute.  See

Haw. Rev. Stat. § 663-8.9.  No Hawaii appellate decision goes

that far.  Because Plaintiffs-Intervenors have not even alleged

physical injury or a diagnosed illness, Defendants' motion for

summary judgment on all NIED claims is granted.

        D.    Other Claims.

           1.    Repatriation Damages.

Defendants argue that Plaintiffs-Intervenors' claims

for repatriation damages are preempted by section 301 of the

LMRA.  The governing CBAs expressly address repatriation

expenses: "[T]he Company shall have no liability for repatriation

of any crew member outside of the Hawaiian Islands."  Ex. 16 at

30; Ex. 17 at 28.  Defendants argue that because the CBAs

explicitly address repatriation damages, these claims are

preempted by section 301.  Actual Discharge Motion at 39.

Plaintiffs-Intervenors do not dispute this contention.

Because the CBAs clearly contain provision addressing

repatriation expenses, the court agrees that such claims are

preempted by section 301 of the LMRA.  The court grants

Defendants' motion on any repatriation claim.

    2.    Limiting Damages Because of After-Acquired Evidence.

In <u>McKennon v. Nashville Banner Publ'g Co.</u>, 513 U.S. 352, 363 (1995), the Supreme Court held that, in a discrimination case, an employee's damages for backpay are limited if the employer learns of employee misconduct that would form an independent basis for termination, even if such information would not have been discovered absent the discrimination lawsuit.  The Court noted that backpay should be calculated from the date of unlawful discharge to the date the information was discovered.

The Ninth Circuit clarified that backpay can be limited based on after-acquired evidence of an employee's misconduct "only if [the employer] can prove by a preponderance of the evidence that it would have fired the employee for that misconduct."  <u>O'Day v. McDonnell Douglas Helicopter Co.</u>, 79 F.3d 756, 761 (9th Cir. 1996).  Under this standard, "[t]he inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals . . . ."  <u>Id.</u> at 759.

In his August 13, 2007, deposition, Alziam testified that he had been discharged in 2002 by another employer--Global Link--for using a training certification purchased from another individual.  Dep. of Nagi Ahmad Alziam (Aug. 13, 2007) at 102-03.  Two days after Alziam was fired by Global Link, he began working with another ship, Atlantic Guardian.  <u>Id.</u> at 41.

45

According to NCL America's Human Resources Manager, Fay Rawles-Schoch, NCL America has a policy providing for the discharge of employees who have engaged in falsification or dishonesty.  This includes "falsification regarding maritime credentials or training."  Rawles-Schoch Decl. at ¶ 8.  Rawles-Schoch identified two independent incidents that would have warranted terminating Alziam: 1) a previous discharge by another employer for "fraudulent documentation," and 2) sailing with another employer using the same fraudulent documentation even after learning that this was prohibited.  Id.

Plaintiffs have not produced any evidence disputing Defendants' contention that Alziam would have been fired upon discovery of his misconduct.  Plaintiffs-Intervenors Opp'n to Discharge Motion at 31.  Accordingly, the court concludes that Defendants have established--through testimony by a Human Resources Manager and citation to company policy--that Alziam would have been terminated.  Accordingly, Defendants' motion with regard to the limiting of Alziam's damages is granted.

E.    Rule 11 Sanctions.

Rule 11 sanctions should be imposed if a paper is filed for an "improper purpose" or is "frivolous."  Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc).  A filing is frivolous if it is "both baseless and made without a reasonable and competent inquiry."  Id.

46

Defendants have filed two motions for Rule 11 sanctions.  In one motion, Defendants argue that sanctions should be imposed against Plaintiffs-Intervenors for filing time-barred claims.  In the other motion, Defendants contend that sanctions should be imposed against all Plaintiffs based on their filing of a religious discrimination claim, which was not based on a reasonable inquiry and lacks evidentiary support.  Defendants have not prevailed on their accompanying motions for summary judgment on these issues and therefore cannot establish frivolousness.  The court denies both motions for Rule 11 sanctions.

V.        CONCLUSION.

The court grants Defendants' Constructive Discharge Motion with regard to the NIED claim, but denies the motion with respect to all remaining claims.  With respect to Defendants' Actual Discharge Motion, the court grants Defendants' motion with regard to the NIED claims and repatriation damage claims, and limits Alziam's damages because of after-acquired evidence.  In all other respects, the Actual Discharge Motion is denied.  The court denies the EEOC's counter motion for summary judgment and both of Defendants' motions for Rule 11 sanctions.  All joinders are terminated consistent with this order, and the EEOC's request to strike, Doc. No. 263, is itself stricken.

This order leaves for future adjudication all Title VII and § 1981 claims, as well as Haw. Rev. Stat. § 378-2 claims and IIED claims.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February, 19, 2008.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
United States District Judge

**EEOC v. NCL America, Inc., et al.**, Civ. Nos. 06-00451, 07-00372 SOM/BMK; ORDER GRANTING IN PART AND DENYING IN PART NCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY OR ON BEHALF OF PLAINTIFF-INTERVENOR SAMED KASSEM; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT NCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS BY THE EEOC AND BY INTERVENORS; ORDER DENYING EEOC'S COUNTER MOTION FOR SUMMARY JUDGMENT; ORDER DENYING BOTH OF DEFENDANT NCL AMERICA, INC.'S MOTIONS FOR RULE 11 SANCTIONS